United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BROSAMER & WALL, INC.,

    Plaintiff,

v.

INDIAN HARBOR INSURANCE COMPANY; and ZURICH AMERICAN INSURANCE COMPANY,

    Defendants.

No. C 19-01872 WHA

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this insurance action, an insured moves for partial summary judgment against two insurers and one insurer moves for summary judgment against the insured. To the extent stated below, these motions are **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

This insurance action stems from flawed soil testing that led to cracking in levees freshly constructed by plaintiff Brosamer & Wall, Inc., for the Santa Clara Valley Water District. When it came to light that Brosamer had used nonconforming soil, the District, pursuant to the project's contract, demanded Brosamer remove and replace the nonconforming soil, rather than merely fix the top layer of cracking soil. The levee remediation plan cost the company $4.6 million. The District, apparently satisfied, never sued Brosamer.

Brosamer, however, sought insurance reimbursement for its extra expense. Defendant Zurich American Insurance Company insured Brosamer against "builders risk." Defendant Indian Harbor Insurance Company insured Brosamer against "professional and contractor pollution legal liability" for consecutive years, covering 2017–18 and 2018–19. Both insurers denied coverage and, to the extent any duty to defend existed, both refused to defend. This action followed.

Our story began in June 2016 when the Santa Clara Valley Water District hired Brosamer as the general contractor for a flood-protection project at the lower Berryessa Creek in Santa Clara County. The work involved constructing floodwalls, improving levees, and widening creek channels along the lower Berryessa Creek. The project specified certain soils be used:

> Imported borrow materials and Native soils obtained from channel excavation and structural excavation and that meet the requirements listed in this Article shall be used in embankment construction, including materials for the new levee fill.

The specifications further required that the chosen materials meet certain characteristics, such as a "Plasticity Index (PI) in the range of 10 to 20." The cracking evidently resulted from soils whose plasticity index measured too high (Decl. Faoro Exh. C at 16).

As quoted, the specifications allowed use of soils native to the project site or imported materials, so long as whichever used met the given characteristics. William Faoro, Brosamer's area manager responsible for supervision of the project, explained in his deposition that the company preferred using native soils for time and cost saving. Brosamer's initial testing, however, "showed that natives would not meet the requirements" of the project. Instead, Brosamer planned on importing leftover materials from nearby projects. Because those local projects were nearing completion, the materials would be hauled away and unavailable if not then used in 2017 (Faoro Dep. 24–25, 29).

The District, however, asked Brosamer to postpone construction of certain levees until 2018 due to unrelated complications. As a result, the materials set aside disappeared. To fill the void, Brosamer proposed using native sandy and clay soils blended to achieve the required plasticity levels. To develop and test blends for compliance with the project specifications,

2

Brosamer brought on Twinings, Inc., a materials-engineering subcontractor. After a months-long process, the District accepted the new soils and construction recommended in 2018 (Dkt. No. 61-8 at 2).

Unfortunately, the new soil led to new issues. On July 13, 2018, Brosamer and the District conducted an inspection of the completed southern half of the project. The walk-through revealed shoulder and levee embankment cracking. Manager Faoro, not in attendance, learned of the cracking in the week that followed. In his deposition, he testified that "during the inspection they observed some cracks in the levy" and "from there an investigation started . . . [that] lasted several months" (Faoro Dep. 21).

During this time, a side plot thickened concerning the professional-liability policies issued by Indian Harbor. For at least four years, Indian Harbor had insured Brosamer against professional liability. Each September 1, a new, year-long policy began. For the 2018–19 policy, Brosamer's broker began the renewal application process in April 2018.

In the application, Brosamer co-owner Charles Wall answered "No" to two questions: One asked, "[h]as any pollution or professional claim, suit or notice of incident been made against [Brosamer]?" The other asked, "[i]s any member of your firm . . . aware of any circumstance which may result in any project delay, professional or pollution liability claim, suit, or notice of incident/occurrence against them?" (Decl. Wall ¶¶ 4, 5; Decl. Baker ¶ 9).

On July 10, a few days *before* the District's levee inspection, Brosamer's broker delivered the completed renewal application to Indian Harbor and requested a quote for the renewal. As will become evident, the overlapping timing of the renewal process for the liability policy and the ongoing levee investigation put the "known circumstances or conditions" exclusion to that policy at issue. The exclusion provided:

> This policy does not apply to any claim [or] professional loss . . . arising from:
>
> 1. a claim [or] professional loss . . . known by a responsible insured prior to the inception of the policy period; or [¶]
>
> 3. a circumstance or condition known by a responsible insured prior to the inception of the policy period where the responsible insured should have reasonably foreseen that a claim, professional loss or pollution loss would result[.]

3

A responsible insured meant "any officer, director, partner, member, manager, supervisor or foreman of any insured or any employee . . . that has responsibility, in whole or in part, for risk control, risk management, health and safety or environmental affairs, control or compliance."

Manager Faoro ranked as one such "responsible insured," both as a manager and as a representative responsible for risk control and risk management. On July 20, one week after the inspection, the District's project manager sent an email to Manager Faoro and others, providing:

> The shoulder and levee embankment cracking leads us to believe there maybe [sic] underlying reasons why the AC road is cracking. Are [sic] wish is to determine the underlying reason for the cracking.
>
> Therefore, in accordance with . . . the Specifications the District hereby rejects all of the levee embankment and AC maintenance trail constructed in the 2017 season due to obvious workmanship issues. [. . .] Until such time that we can determine the cause and limits of the cracking no repair shall be performed.
>
> At this time we would also request that your QC firm, Twining, perform an inspection and determination of what they believe the issue would be.

By deposition, Manager Faoro testified to his understanding around the time he received the email (Faoro Dep. 55):

> Q: [To] frame our conversation with reference to . . . the July 20, 2018 email. At that time did you have an understanding that the water district was seeking to hold Brosamer & Wall responsible for the cracking?
>
> A: I mean, I did not know. It was during the investigative stages here. We had to find out why it was cracking.
>
> Q: Do you believe it was possible that the water district would try to hold Brosamer & Wall responsible for the cracking at this time?
>
> A: Yeah, I believe that it would be possible.

Meanwhile, Brosamer's broker negotiated the liability policy and, "prior to late-August 2018," the parties reached a deal. Owner Wall executed the application on August 29.

Two days later, the District's project manager sent Brosamer a letter explaining that the material used in Levee 11 did not meet the project requirements. The project manager deemed the material unacceptable. More testing and investigation ensued.

4

On November 20, the District sent Brosamer a letter cataloging the alleged deficient work and outlining an acceptable levee remediation plan. The claim letter provided in part:

> The District has reviewed [Brosamer's] quality control tests submitted to the District via email on August 1 and 8, 2018. Included in both emails are . . . Reports for the Levee Fill Materials used in the construction of Levees 11, 12, 13, and 14 in 2017 and 2018. . . . These reports have identified deficient work related to construction of Levees 11, 12, 13, and 14 which was rejected by the District on July 20 (by email) and August 31, 2018 (by letter).
>
> On September 18, 2018, the District submitted an email to [Brosamer] outlining an acceptable levee remediation criteria. Since that time, deeper . . . sampling and laboratory testing of Levees 12, 13, 14 were . . . were submitted by Geocon on October 26, 2018. The plasticity index for Levee 14 is slightly higher than required, and our field observations noted some cracking on the pavement maintenance path and levee side slopes. An acceptable remediation to mitigate for Levee 14 was determined by the District and is summarized below including the remediation criteria for Levees 11, 12, and 13.
>
> [Brosamer] shall provide to the District a levee remediation plan by January 15, 2019 addressing the rejected levee work.

By declaration, Owner Wall swears that "Brosamer" first learned of the levee cracking issue on July 13 and, at that time, it did not anticipate a delay or resulting liability suit. On October 19, Twining disclosed for the first time that its test results had been flawed and understated the plasticity levels. Owner Wall swears that it still, as of July 13, remained insufficiently clear whether the flawed test results explained the cracking issue; whether and to what extent the cracking would require extensive supplemental work; and whether the District would seek to hold Brosamer responsible. Only upon receipt of the November 20 "claim letter" did Brosamer understand that a professional liability claim had arisen (Decl. Wall ¶¶ 8–14).

In mid-December, the District's project manager confirmed that a change order would issue to address the schedule of the unfinished levee work through 2019. The District finalized the change order in June 2019, requiring, among other things, that the upper two-and-a-half to three feet of levee fill be removed and replaced "with suitable levee materials."

The insurers' involvement with this case began in earnest on November 30, 2018, when Brosamer sent each insurer the District's claim letter. The policies are discussed at length

5

below. Briefly, Indian Harbor issued consecutive, year-long policies beginning and ending on September 1. For certain claims, a ninety-day extended reporting period stretched the policy's coverage to include claims reported as late as November 30. Brosamer tendered the District's claim letter to Indian Harbor on November 30, 2018, creating at least a possibility for coverage under either the 2017–18 policy or the 2018–19 policy.

Indian Harbor acknowledged receipt of the claim letter in early December 2018. The first "coverage advisory" it issued came on March 19, 2019. Indian Harbor sent subsequent denials in July 2019 and October 2019. The letters deny coverage under both policies based on untimely notice, exclusions for "known circumstances," and failure to meet several conditions precedent to coverage (Dkt. No. 59-3, 61-15).

\* \* \*

Zurich's "builders risk" policy, on the other hand, constituted a first-party insurance policy triggered by "direct physical loss of or damage to covered property." Covered property included property under construction and temporary works such as scaffolding, subject to several exclusions.

When notified of the potential covered loss, Zurich hired EFI, Global, Inc., to investigate. EFI completed two reports, one in December 2018, the other in April 2019. In both reports, EFI concluded that "[t]he soil desiccation cracking observed was caused by drying of the soils with a high plasticity index[.]" In its April 2019 report, EFI also concluded that "the majority of the samples [of soils] tested did not meet the requirements of Santa Clara Valley Water District Specifications."

In August 2019, Zurich denied coverage to remove and replace the levee soils under the policy's "cost of making good" exclusion, which excluded the cost of fixing the insured's own snafus. But for expenses Brosamer incurred repairing the cracked asphalt maintenance path on one levee, Zurich paid out over $300,000.

To date, as stated, the District has not sued Brosamer. Rather, Brosamer met the District's demands in its change order. This involved removing and replacing the top two to three feet of nonconforming soil from the levees to the tune of roughly $4.6 million.

6

In April 2019, Brosamer sued Indian Harbor for declaratory relief, breach of contract, bad faith, and Section 17200 violations. Brosamer added Zurich a few weeks later.

A prior order granted Indian Harbor leave to amend its answer five months into the action, adding an affirmative defense about a misstatement or omission on the renewal application; the tendered 2018–19 policy number in a general allegations paragraph; and "professional loss" as to an existing affirmative defense (Dkt. No. 49).

Brosamer now seeks summary judgment against both insurers. Against Zurich, Brosamer focuses on one issue: Whether or not the "cost of making good" exclusion in the "builders risk" policy precludes or limits relief for Brosamer in this action. Zurich does not move for summary judgment, but it does move to allow further discovery under Rule 56(d) related to Brosamer's motion.

Against Indian Harbor, Brosamer moves for partial summary judgment on three issues under the 2017–18 liability policy: (1) the enforceability of the parties' choice-of-law clause; (2) whether Brosamer provided effective notice to Indian Harbor of the District's claim; and (3) whether the District's claim involved an act, error, or omission in "professional services."

Indian Harbor moves for summary judgment against Brosamer seeking enforcement of New York law and raising six supposed bars to coverage under both liability policies.

This order follows full briefing and a hearing.

**ANALYSIS**

Summary judgment is appropriate when there is no genuine dispute as to any material fact. A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

1. **THE INDIAN HARBOR POLICIES.**

This section resolves the overlapping motions between Brosamer and Indian Harbor. Both seek a decision on the applicable state law. They ask for rulings on six coverage issues.

    *A.    CALIFORNIA LAW GOVERNS.*

The liability policies selected New York law to govern all issues arising under or related to the policies. When a federal district court is sitting in a diversity action, it must apply the

choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Manufacturing Co., Inc.*, 313 U.S. 487, 496 (1941). When there is a valid, bargained-for choice-of-law provision in a contract, California courts apply the approach outlined in the Restatement Second of Conflict of Laws Section 187. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 464–65 (1992). Section 187 provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a)  the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b)  the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of Section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

In short, a district court must first determine "(1) whether the chosen state has a substantial relationship to the parties or their transaction or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law." If the first prong is met, a court must then determine whether the chosen state's law is contrary to a fundamental policy of California. If so, then the court must weigh whether California has a materially greater interest than the chosen state in determining a particular issue. *Nedlloyd*, 3 Cal.4th at 466.

Indian Harbor bears the burden under the first prong. If demonstrated, Brosamer bears the burden on the second. *Washington Mutual Bank v. Sup. Court*, 24 Cal.4th 906, 917 (2001).

"A substantial relationship exists where one of the parties is domiciled or incorporated in the chosen state." *Nedlloyd*, 3 Cal. 4th at 465. Brosamer is a California company headquartered in California. Indian Harbor is a Delaware company with its principal place of business in Connecticut (Decl. Briggs ¶ 12). So, New York is a no go.

But, does New York have a substantial relationship to the *transaction*? The obligations under the policy, including any duty to defend, were to be performed in California. Indian Harbor does not dispute this. The only factual support given that *could* tie New York to the transaction is a senior claims specialist's sworn declaration that "[t]he signature on the two policies that are at-issue in this case are of the President and CEO of Indian Harbor, who is located in New York" (Decl. Briggs ¶ 14). The declaration, however, is nothing but smoke and mirrors. It does not state where the documents were *executed*. It does not tell us where the executive lived or worked either, only where he was "located." In contrast, the documents containing the signatures prominently display Indian Harbor's Pennsylvania regulatory office address and a witness clause. The documents make no reference to New York (Decl. Faoro ¶ 17; Exh. O at 66; Exh. P at 51).

Indian Harbor focuses instead on the catch-all in the Restatement, some "other reasonable basis for the parties' choice." The theory is twofold. Indian Harbor argues that there is a reasonable basis for choosing New York law because (Decl. Briggs ¶¶ 9–17):

> (1) given its other contacts with New York — including a New York office; employees, directors, and officers in New York; affiliated entities incorporated in New York (its parent company's parent); and "New York businesses;"
>
> (2) it has "elected to include a New York choice of law clause in the types of policies that are at issue in this case . . . in an attempt to maintain uniformity, clarity, and consistency in the application of its policies, for the benefit of itself and its policyholders."

Indian Harbor's best support is *1-800 Got Junk? LLC v. Superior Court*, 189 Cal. App. 4th 500, 513–15 (2010), which found a reasonable basis for the parties' choice of Washington law, despite Washington indisputably lacking a substantial relationship to the transaction or the parties. *Got Junk* held:

> Because a multi-state franchisor has an interest in having its franchise agreements governed by one body of law, Got Junk had a reasonable basis for inserting a choice of law provision in the franchise agreement. Further, given Washington State's proximity to Got Junk's headquarters in Vancouver, Canada, there was a reasonable basis for the designation *of that state's law in particular*.

9

*Id.* at 515 (emphasis added). The first sentence of this holding is irrelevant here. Brosamer does not challenge Indian Harbor's ability to insert a choice-of-law provision in its policies; the dispute is over which state it chose. The crucial portion of *Got Junk*'s holding is the second sentence, finding it reasonable for a Canadian company to designate the state law of the state (Washington) nearest the Canadian home office (Vancouver). That is a reasonable basis particular to Washington and independent from the minimum-contacts analysis that requires domicile or incorporation. In this way, *Got Junk* demonstrates where Indian Harbor's choice-of-law provision went wrong.

During oral argument, Brosamer noted that *Got Junk* is an anomaly because it was the party that inserted the choice-of-law clause there who sought to apply a different law. Because the decision supports Brosamer's position anyway, rather than Indian Harbor's, this order does not reach the anomaly point (other than to note it *was* odd that the drafter would run away from its own agreement).

Indian Harbor also notes that the policies contain a forum-selection clause "favoring" New York. It does not, however, provide authority for the proposition that a voluntary forum-selection clause can take the place of a "substantial relationship" to establish a "reasonable basis" for applying that state's law. In every decision Indian Harbor cites that analyzes the "reasonable basis" issue, there is a "substantial relationship" between the state and the parties or the transaction in addition to any supporting forum-selection clause. None of the decisions indicate that the forum-selection clause alone could support the parties' choice of law.

For example, *Insurance Auto Auctions, Inc. v. Indian Harbor Ins. Co.*, 2010 WL 11688494 at *3 (W.D. Wa. Sep. 16, 2010) (Judge Richard Jones), looking at the same choice-of-law and forum-selection clauses, found a substantial relationship because the plaintiff had facilities in New York covered by the policy and because the policy identified New York in the forum-selection clause. Importantly, however, the decision noted that the policy covered:

> [E]ach of the approximately thirty states in which [the plaintiff] ha[d] a facility, so all of those states (including New York and Washington) ha[d] the same contacts with the parties and the [p]olicy. Thus, New York, like Washington, ha[d] a substantial relationship with the [p]olicy by virtue of the location of [the

10

> plaintiff's] facilities. This approach is consistent with the Restatement's discounting the importance of the location of an insured risk at issue when the policy insures against risks located in several states.

*Ibid.* Here, everything about the project, down to the soil, remained local to California. New York lacked the "substantial relationship" required for the parties to contract around the laws of California.

Indian Harbor relies on several other decisions that look to other contacts beyond one party's domicile or principal place of business. They all are unavailing. At least one of the parties in each decision was domiciled or had its principal place of business in the chosen state. In *CQL Original Products, Inc. v. National Hockey League Players' Assn.*, 39 Cal. App. 4th 1347, 1355 (1995), *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1003 (9th Cir. 2010), and *International Business Machines Corp. v. Bajorek*, 191 F.3d 1033, 1038 (9th Cir. 1999), the state of the chosen law was the defendant's principal place of business. In *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015), the bank-plaintiff had its principal place of business and was chartered in the state. In *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 537 (C.D. Cal. Nov. 4 2013) (Judge Josephine Staton), a putative class action challenging force-placed insurance practices, the mortgage contracts chose the law of the state where the encumbered property lay. Because the property was the subject of the mortgage contract, *Gustafson* found a substantial relationship with the parties and the transaction. Judge Staton's decision cited to an unpublished prior-decision of the undersigned judge, where Arkansas had a substantial relationship to the parties and their transaction, inasmuch as the property lay in Arkansas, the plaintiffs resided in Arkansas, and the mortgage derived from an Arkansas company. *Lane v. Wells Fargo Bank N.A.*, 2013 WL 269133 at *4 (N.D. Cal. Jan. 24, 2013).

Finally, Indian Harbor relies on two decisions from the same case, *Pitzer College v. Indian Harbor Insurance Company*. The district court decision provided no analysis for its conclusion that it had "no question that there [was] at least a 'reasonable basis' for the selection of New York law." *Pitzer College v. Indian Harbor Insurance Company*, 2014 WL 12558276 at *5 (C.D. Cal. May 22, 2014) (Judge George Wu). The California Supreme Court,

11

answering certified questions from our court of appeals, did not reach the issue, noting that the parties did not contest the district court's "reasonable basis" finding. Neither decision informs this order's analysis.

Because Indian Harbor has failed to establish a "reasonable basis" for choosing New York law, this order will not opine on California's fundamental policies or New York's and California's competing law enforcement interests. *Nedlloyd*, 3 Cal.4th at 466. California law governs the liability policies here.

### B. THERE IS NO COVERAGE UNDER THE 2017–18 POLICY.

#### *(i) The Claim Did Not Involve Professional Loss.*

Indian Harbor disputes whether Brosamer effectively tendered a notice of the District's claim to trigger coverage for professional loss under the 2017–18 policy. This order need not reach the issue because even with effective notice, the definition of professional loss excluded Brosamer's claimed loss.

The 2017–18 policy defined professional loss as:

1. a monetary judgment, award or settlement of compensatory damages;

2. civil fines and penalties assessed against a third party other than an insured for which the insured is legally liable, but only where insurance coverage for such fines and penalties is allowable by law;

3. civil fines and penalties assessed against the insured, but only where insurance coverage for such fines and penalties is allowable by law;

4. punitive, exemplary or multiplied damages for which the insured is legally liable, but only where insurance coverage for such damages is allowable by law;

5. Legal expense associated with subsections Y.1. though Y.4. referenced above.

Professional loss does not include: (i) injunctive or equitable relief; (ii) the return of fees or charges for services rendered; (iii) *costs and expenses incurred by the insured to redo, change, supplement or fix the insured's work or service, including redesign*; or (iv) any of the insured's overhead, mark-up or profit.

The primary issue here is that the policy specifically excluded "costs and expenses incurred by the insured to redo, change, supplement or fix the insured's work or service, including redesign." Brosamer replies that Indian Harbor still had a duty to defend its insured and refused to do so, leaving Brosamer to do its best to mitigate its damages.

The District never instituted any lawsuit against Brosamer. While the policy broadly defined "claims" to include a "monetary demand or notice, or assertion of a legal right alleging liability or responsibility on the part of any" insured, the District's claim letter did not make a monetary demand on its face. But it did demand that Brosamer submit a plan for levee remediation to cure the cracking issues. *The definition of professional loss excluded "costs and expenses incurred by the insured to redo, change, supplement or fix the insured's work or service, including redesign."* Far and away, this is the most important expense incurred by the insured and it is specifically not covered as professional loss. The most that could theoretically be covered is the legal expense incurred by Brosamer in responding to the letter. Brosamer, however, has not requested such insignificant relief and has chosen to swing for the fences, striking out instead.

### *(ii)* *No Rectification-Expense Coverage is Available Under the 2017–18 Policy.*

Distinct from the policy's coverage for professional loss, the policy also provides for coverage of rectification expense, defined as follows:

> RECTIFICATION EXPENSE means direct costs and expenses that the Company deems reasonable and necessary to mitigate or rectify an act, error or omission in PROFESSIONAL SERVICES or to prevent further damages resulting from said act, error, or omission.

Indian Harbor argues that Brosamer is not entitled to rectification-expense coverage under the 2017–18 policy because Brosamer failed to timely notify Indian Harbor of the error at issue and the proposed corrective action. Brosamer decided not to address this issue in its opposition.

The extended reporting period that allowed reporting of a professional-loss claim until November 30 expressly did not apply to rectification-expense coverage. Brosamer had until September 1, 2018, to secure rectification coverage under the 2017–18 policy. Brosamer

13

reported the District's claim to Indian Harbor three months too late. Because Indian Harbor limited this issue to the 2017–18 policy, this order has no occasion to consider rectification-expense coverage under the 2018–19 policy.

### C. COVERAGE UNDER THE 2018–19 POLICY.

#### (i) Triable Issues Remain as to Brosamer's Knowledge of the Claim When it Applied for the 2018–19 Policy.

Indian Harbor's two arguments for denying coverage under the 2018–19 policy stem from the same argument: That Brosamer should have disclosed its knowledge of circumstances that could have led to a claim in the renewal application.

*First*, the policy precluded coverage for:

> A circumstance or condition known by a Responsible Insured prior to the inception of the Policy Period where the Responsible Insured should have reasonably foreseen that a claim, negligent act, error or omission in Professional Services, Professional Loss . . or Rectification Expense . . . could be incurred.

The parties agree that the question is whether Brosamer should have reasonably foreseen that a covered loss could be incurred based on its knowledge of the cracking issue prior to the inception of the policy. The scuffle here is whether or not this is a factual question for the jury to decide. This order finds that it is.

Even if the reasonable-foreseeability question prompts an objective inquiry, as Indian Harbor argues, that inquiry still would require a trier of fact to weigh the evidence and determine whether Brosamer, with knowledge of the cracking issue, should have reasonably foreseen that a covered loss could be incurred. When the evidence is viewed in the light most favorable to Brosamer, a reasonable trier of fact could conclude that Brosamer could have reasonably determined that a covered loss would not be incurred. When viewed the opposite way, a fact finder could easily conclude that Brosamer should have reasonably foreseen a covered loss would be incurred. This is a triable issue.

*Second*, Indian Harbor argues that Brosamer's "no" response to the following two questions in the renewal application constituted material misrepresentations sufficient to bar coverage: (1) "Has any pollution or professional claim, suit or notice of incident been made

14

against [Brosamer]?" (2) "Is any member of your firm . . . aware of any circumstance which may result in any project delay, professional or pollution liability claim, suit, or notice of incident/occurrence against them?" For the same reasons the prior argument fails, so too does this one. The issue must be tried.

### *(ii)* *The Claim Arose Out of Professional Services.*

Coverage under both the 2017–18 and 2018–19 policies, whether for professional loss or rectification expense, required that the claim result from an act, error or omission in "professional services." The policy defined "professional services" as "value engineering," "field changes to design," and "constructability reviews." The policy did not define these three terms. Instead, the parties provided their own definitions in written discovery.

The parties defined "value engineering" as:

| | |
|---|---|
| Indian Harbor: | A formal process for determining methods for performing a construction job more efficiently or economically. |
| Brosamer: | A strategy in which a process, product, system, service, supply, or other aspect of a project, is analyzed in an effort to increase its overall value — specifically in order to maximize cost savings and/or efficiencies. Value engineering can occur at any phase of a given project, including after the design and construction has begun. |

Brosamer contends that its work to find a soil replacement constituted "value engineering." When the original soils Brosamer planned to use disappeared, the District, Brosamer, and Brosamer's subcontractor engaged in a months-long process to determine an alternative source for the soil. Brosamer proposed using native sandy and clay soils blended to achieve the required plasticity levels. Brosamer's subcontractor tested the proposed blends and ensured that the final materials met the project specifications. After a months-long process, the District accepted Brosamer's recommended soils and construction recommenced in 2018. On its face, this process fits both definitions.

Indian Harbor, however, argues that the use of native soils rather than offsite soils did not constitute value engineering as such use was both contemplated originally and resulted from

15

necessity due to the District's delays that caused the offsite soils to become unavailable. Indian Harbor points to various letters in the record that rather than discuss decisions of economy or efficiency, show that the decision to use native soils came out of necessity in response to the District's delays. On the other hand, Brosamer points to the correspondence and argues it shows the process was designed to make the project more efficient and economical. Because value engineering is not defined or explained in the policies, the term is ambiguous and will be interpreted in favor of coverage. *California State Auto. Assn. Inter-Ins. Bureau*, 94 Cal. App. 3d 113, 118 (1979).

\* \* \*

For the reasons stated above, summary judgment is granted as follows: (1) California law governs both policies, (2) professional-loss coverage is barred because the definition of "professional loss" specifically excludes the claimed loss, (3) rectification-expense coverage is barred under the 2017–18 policy because Brosamer did not timely report the claim under that coverage part, (4) the claim involved an act, error, or omission in "professional services."

Triable issues remain as to (1) whether the "known circumstances of conditions" exclusion bars coverage and (2) whether Brosamer made misrepresentations in its renewal application for the 2018–19 policy.

Rectification-expense coverage under the 2018–19 policy remains an open issue, subject to the argument that Brosamer's notice came late.

2. **THE ZURICH POLICY.**

Zurich insured Brosamer against "builders risk." The parties presume application of California law so this order adopts California law.

Brosamer moves for partial summary judgment against Zurich on one issue: Whether the cost-of-making-good exclusion bars coverage. It is "axiomatic that the insurer has the burden of proving that an otherwise covered claim is barred by a policy exclusion." *Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal. App. 4th 1440, 1453 (1998). Nevertheless, "[w]hile the burden is on the insurer to prove a claim covered falls within an exclusion, the burden is on the

16

insured initially to prove that an event is a claim within the scope of the basic coverage."

*Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532, 537 (1986).

The Zurich policy's coverage provision provided:

> This Master Policy, its quarterly reports and all Project Certificates issued hereunder, subject to the terms, exclusions, limitations and conditions contained herein or endorsed hereto, *insures against all risks of direct physical loss of or damage to Covered Property while at the location of the insured project* and occurring during the Policy or Certificate Term.

The policy defined covered property as "property under construction" and "temporary works."

The claim implicated "property under construction," defined as:

> All property, including materials, supplies, equipment, machinery, and other property of a similar nature, being property of the Insured or of others for which the insured may have assumed responsibility, that will become a permanent part of the INSURED PROJECT*, the value of which has been included in the estimated TOTAL PROJECT VALUE* . . . .

Zurich argues there was no direct physical loss of or damage to the property. We do not need to reach this threshold coverage issue because the policy's "cost of making good" exclusion applied.

This exclusion precluded payment of expenses resulting from:

> The costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the loss or damage:
>
> (1) Fault, defect, error, deficiency or omission in design, plan or specification;
>
> (2) Faulty or defective workmanship, supplies or material;
>
> (3) Wear and tear, gradual deterioration, inherent vice, latent defect, corrosion, rust, dampness or dryness of the atmosphere;
>
> However, if direct physical loss or damage by an insured peril ensues, then this Policy will cover for such ensuing loss or damage only.
>
> For the purpose of this Policy and not merely this exclusion, Covered Property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under (1), (2) or (3) above.

17

All agree that the soils used constituted "material." The issue turns on whether the soils qualified as "faulty" or "defective."

Insurance policies are construed to give words their popular and ordinary meaning. "The clause must be construed with regard to the contract as a whole, and its meaning is to be derived from the circumstances of the particular case and not in the abstract." *Tzung v. State Farm Fire and Cas. Co.*, 873 F.2d 1338, 1340 (9th Cir. 1989). "Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the "ordinary and popular sense of the word if it disregards the policy's context." *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 649 (2003).

The Zurich policy did not define "faulty" or "defective." Zurich urges us to look to the District's and Brosamer's contract to shed light on the word "defective." Under the construction contract, Brosamer agreed that "materials not conforming to the requirements of the Contract shall be considered as defective." In full, the Section 10.05 provides:

> All materials not conforming to the requirements of the Contract shall be considered as *defective* and all such materials shall be rejected, whether in place or not. They shall be removed immediately from the site of the work, unless otherwise permitted by the Engineer. No rejected material, the *defects* of which have been subsequently corrected, shall be used unless approval in writing has been given by the Engineer. If the Contractor should fail to comply promptly with any order of the Engineer made under the provisions of this article, the Engineer may cause *defective* materials to be removed and replaced, and the costs thereof to be deducted from moneys due, or to become due, the Contractor.

Although Zurich is not a party to the District contract, the provision squarely fits Brosamer's claimed loss. The provision also militates in favor of finding that the ordinary meaning of "defective" in this case includes nonconforming materials. It both comports with the plain language of the exclusion and provides context that must be considered.

Brosamer disagrees, arguing that the focus should be on the insurance policy. Rather than suggest an alternative ordinary meaning for "faulty" or "defective," Brosamer argues that an entirely different word — "unsuitable" — is the term that Zurich and Brosamer contracted to use for describing soils that did not comply with the project specifications. Brosamer's only example of "unsuitable" in the insurance policy comes from the project certificate's description

18

of the insured project. One of Brosamer's many contractual obligations to the district listed in the description is: "Channel excavation and embankment, including the testing and disposal of unsuitable materials" (Dkt. No. 56-11 at 2). The other example Brosamer relies on is the District's claim letter that demanded that Brosamer remove and replace certain soils "with *suitable* levee materials."

These examples fall victim to the same criticism Brosamer levies on Zurich. But only Section 10.05 is helpful in understanding the ordinary meaning of "defective" here.

Brosamer also argues that the dictionary definition of defective does not support application of the exclusion. Black's Law Dictionary defines defective as:

> 1. (Of a position, right, act, or process) lacking in legal sufficiency <defective execution of documents> <defective service of process>.
>
> 2. (Of a product) containing an imperfection or shortcoming in a part essential to the product's safe operation <defective wiring caused the accident>.

The second definition is apt when viewed in the policy's context. The District's demand that a full two to three feet of the levee fill materials be removed, rather than just the cracked surfaces, suggests the import of the plasticity specifications is more than cosmetic. While the record does not explain one way or the other whether the soil specifications serve a safety purpose, construction of insurance policies should take into account the circumstances of the particular case. *Tzung v. State Farm Fire and Cas. Co.*, 873 F.2d 1338, 1340 (9th Cir. 1989).

This order finds that nonconforming soils constitute "defective materials" under the policy's "cost of making good" exclusion. This defeats coverage.

**CONCLUSION**

For the reasons stated herein, summary judgment is **GRANTED** as follows: (1) California law governs both policies, (2) professional-loss coverage is barred because the definition of "professional loss" specifically excludes the claimed loss, (3) rectification-expense coverage is barred under the 2017–18 policy because Brosamer did not timely report the claim under that coverage part, (4) the claim involved an act, error, or omission in "professional services."

19

Triable issues remain as to (1) whether the "known circumstances of conditions" exclusion bars coverage and (2) whether Brosamer made misrepresentations in its renewal application for the 2018–19 policy. As to these issues, Indian Harbor's motion for summary judgment is **DENIED**.

Rectification-expense coverage under the 2018–19 Indian Harbor policy remains an open issue, subject to the argument that Brosamer's notice came late.

The Zurich policy's "cost of making good" exclusion defeats coverage. Brosamer's motion for partial summary judgment against Zurich is **DENIED**.

Zurich's and Indian Harbor's motions under Rule 56(d) are both **DENIED**.

**IT IS SO ORDERED.**

Dated: March 3, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE